UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RONALD WEST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:17-cv-03771-MPB-JPH |
| ) | |
| J&B TOOL, LLC, et al. ) | |
| ) | |
| Defendants. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The court conducted a half-day bench trial on January 14, 2020, to resolve plaintiff Ronald West's claims brought against J&B Tool, LLC ("J&B Tool") and Myron Rudicil.[1] Plaintiff's complaint raises the following claims: failure to pay overtime wages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.* (Count I); failure to pay overtime wages pursuant to Indiana's Minimum Wage Statute, Ind. Code § 22-2-2 *et seq.* (Count II); failure to pay wages due and owing, including unused vacation time pursuant to Indiana's Wage Claims Statute, Ind. Code § 22-2-9 *et. seq.* (Count III); conversion of West's personal tools in violation of Indiana's Crime Victim's Relief Act, Ind. Code § 34-24-3 *et. seq.* (Count IV); and replevin (Count V). Plaintiff Ronald West appeared in person and by counsel, Ronald Weldy. Defendant Myron Rudicil appeared both individually and as Corporate Representative for Defendant J&B Tool. Both Defendants were represented by Timothy R. Fox. All parties submitted post trial briefs. (Docket No. 89, Docket No. 90). Only West filed a response brief. (Docket No. 91). The court now issues its findings of fact and conclusions of law pursuant to

---

[1] While William Clements was named as a Defendant in the initial complaint (Docket No. 1) and has never been dismissed by Plaintiff, West did not seek a judgment against Clements at the bench trial. (Docket No. 89).

Federal Rule of Civil Procedure 52(a). Any finding of fact that is more properly considered a conclusion of law is adopted as such, and vice versa. [2]

## I. FINDINGS OF FACT[3]

1. At all relevant times, Defendant J&B Tool, LLC, ("J&B Tool") was a business located in Wayne County, Indiana. (Docket No. 20 at ECF p. 1, ¶ 2). J&B Tool and Myron K. Rudicil are employers under the FLSA. (Docket No. 84 at ECF p. 1, ¶¶ 2–3). Further, J&B Tool is an employer pursuant to Indiana's Wage Claims Statute. (*Id.* at ECF p. 2, ¶ 8).

2. Plaintiff, Ronald West, began working for J&B Tool in the summer of 2014 and was an employee covered by the FLSA under individual coverage. (*Id.* at ECF p. 1, ¶ 1). West was terminated by J&B Tool and Rudicil on July 6, 2017. (*Id.* at ECF p. 1, ¶ 6).

3. J&B Tool made gauges and parts of gauges for other companies. J&B Tools would contract with companies that would send packages of prints for a whole job. West was hired to work on these contracts.

4. West did not have a car. When he first began working for J&B Tool another employee would drive him back and forth to and from work. That employee left sometime after West's employment began. Then, Rudicil would pick West up and take him home. Rudicil typically

---

[2] The parties consented to the magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

[3] The parties agreed upon several trial stipulations. (Docket No. 84). The stipulation also noted that Defendants admitted in the Answer that "Mr. West was not paid overtime premiums when he worked over 40 hours in a workweek." (Docket No. 84 at ECF p. 1, ¶ 5). That statement is, at worst, a misrepresentation of Defendants' answer and, at best, imprecise. The stipulation does not cite to the paragraph of Defendants' answer that it relies on for this proposed admission. Defendants respond to paragraph twenty-one of West's complaint, which alleges "Plaintiff was not paid overtime premiums when he worked over 40 hours in a workweek," by "admit[ting] that [West] was not paid on an hourly basis, but rather paid as a vendor for each part made." (Docket No. 20 at ECF pp. 4–5, ¶ 20). This admission does not translate into a stipulation that West was not paid overtime premiums when he worked over 40 hours in a workweek. There was no admission by Defendants that West ever worked over forty hours.

2

picked West up between 7:00 and 7:30 a.m. and they would begin work at 8:00 a.m. J&B Tool did not maintain time records of when employees worked. (Docket No. 84 at ECF p. 1, ¶ 7).

 5. West testified that he worked seven days a week and that while he always began work at 8:00 a.m., his end time would vary. West testified that on some days he finished work at 5:00 p.m. and other days ending as late as 2:00 a.m. He said it was routine to work at least one weekend day. West's mother, Karla Kaufman, testified that West lived with her off and on during his employment with J&B Tool. However, she could not remember how long West resided with her, but estimated around six months. Kaufman testified that she saw Rudicil pick up her son for work nearly seven days a week, picking him up between 7:00 and 7:30 a.m. and that his drop off time varied. She testified that some days she would be asleep, and her son was not home yet.

 6. Rudicil testified that a typical workday at J&B Tool was 8:00 a.m. to 5:00 p.m. Rudicil testified that he, personally, usually worked forty-five to fifty hours a week because he would drop off West after work and then return to work on paperwork. [4] He testified that he can never remember West working after him. Rudicil testified that he occasionally worked the weekends, particularly Saturdays, to catch up on paperwork. Rudicil testified that West never worked on the weekends and that he never drove West on the weekends.

---

[4] Defendants' own post trial brief states that "Mr. Rudicil never remembers Mr. West working more than five to ten hours of overtime per week." (Docket No. 90 at ECF p. 2). It also alleges that West "was compensated for the overtime he actually worked at J&B Tool." (*Id.* at ECF p. 4). Understandably, West responds that "[i]t appears that Defendants are admitting that Mr. West worked 5 to 10 overtime hours a week[.]" (Docket No. 91 at ECF p. 1). The court has reviewed the trial transcript and the evidence does not support Defendants' statements in their trial brief. Rudicil never provides a statement that could be inferred as an admission that West worked any overtime let alone no more than five to ten hours of overtime. And no evidence was ever presented to support a statement that, if West worked overtime then he was correctly paid for that overtime. Nonetheless, argument in a post trial brief is not evidence. The court relies on the evidence and its credibility determinations in making these findings of fact.

7. The only pay-related records provided by J&B Tool and submitted for the record was Exhibit A, a Check Registry that contains a list of all of the checks written to Mr. West by J&B Tool during his employment. (Docket No. 84 at ECF p. 2, ¶ 11). West was not paid on a consistent basis, but instead was paid "whenever [he] needed the money." (Trial Transcript, 9:11:20). The Check Registry only provides a date, in some cases the check number, whether the check was designated as designated as "payroll wages" or "subcontractors," and the amount of the check. (Exhibit A).

8. West testified that he was always paid on an hourly rate. He testified the he was first paid at $14 per hour and that beginning December 21, 2015, he received a raise to $15 per hour. He testified that originally he could not recall exactly when he got the raise, but upon reviewing the Check Registry there were many checks prior to that date that were easily divisible by $14 per hour. For instance a $112.00 check equaled an 8-hour day whereas a $140.00 check equaled a 10-hour day. However, after December 21, 2015, there were more $120.00 and $150.00 checks, which equaled 8 or 10-hour days at a $15.00 per hour rate. West denied ever discussing getting paid per piece. West testified that he asked Rudicil about getting paid overtime once and was told that J&B Tools could not afford to pay overtime.

9. Rudicil testified that West was originally paid $13.00 per hour, but in February 2014 West wanted to be paid per piece instead of per hour. Rudicil testified that is why West's checks from December 2013 through February 14, 2014, were listed as payroll wages (with taxes withheld) and thereafter as subcontractor (without taxes withheld). Rudicil testified that he was previously an hourly-paid employee who generally understood how overtime worked. He testified that he did not pay West time and one-half, because he was paid based on piece work, not a per hour rate. Rudicil testified that when he cut West a check he would total up all of the

4

piece work on that day and cut one check for completed pieces. When asked why many days had two or three checks listed as cut the same day on the Check Registry, Rudicil testified that it was because West often asked for loans or advances on piece work not yet completed.

10. Rudicil testified at great length as to why the Check Registry had checks listed as cut on Saturdays or Sundays. Rudicil stated that the date he wrote a check to West and the date in the Check Registry did not necessarily align because he did not always update Quick Books simultaneously with paying West. For instance, Rudicil may have written a check to West on a Friday and then returned on Saturday to update Quick Books. Even though the check was written on Friday, Quick Books' date for the check would reflect Saturday, the date that West entered the check. Rudicil testified that Quick Books auto-populated the "Date" with the date he entered the check into Quick Books and he did not always catch it to correct it to that date when the check was actually written (and presumably given) to West.

11. West testified that he built whole gauges and pieces of gauges. He testified that the smallest gauges would generally require work on the same gauge for more than a week. He would work on the gauge some, send it off to be heat treated, work on it more when it returned, and then send it off again to be oxidized. He testified that the largest gauges could take months.

12. Rudicil testified that West never worked on whole gauges, but always pieces of gauges. Rudicil stated that West could finish five or six pieces per day, especially because a lot of pieces did not need to be sent out for heat treating.

13. West testified that when he was terminated on July 6, 2017, he left tools at J&B Tools. He indicated that he contacted Rudicil several times to pick them up and that he eventually retrieved his toolbox, but that $800 of tools remained at J&B Tools, which Rudicil refused to return. West identified by name eight tools or types of tools that J&B Tools had not

returned and testified to an estimated replacement value of each. West testified that Rudicil refused to let him into the building to look for the additional tools, but that Rudicil contacted him and offered to give his tools back if he dropped the lawsuit.

14. Rudicil testified that after West initially contacted him regarding the tools, he looked for and returned all of West's tools that were in the shop. Rudicil stated that West never had any other tools and that he had never talked to West after the lawsuit was filed.

15. As reflected above, there was conflicting testimony on several issues presented at trial, which the court has considered in arriving at its factual conclusions. The court generally finds West's testimony incredible. For reasons explained herein, his "theory" for calculating how many hours he worked based on his paychecks does not always align with his own testimony and in other instances his theory is simply impracticable. West also admitted to serious substance abuse while he was employed with J&B Tool, confiding that, "I had a drug problem and I needed that money every day and he [Rudicil] paid it to me every day." (Trial Transcript, 9:38:28). West admitted, and the court agrees, that his drug issue affected his memory. (Trial Transcript, 9:39:00, Q: "Do you think your memory would be a little fuzzy having drug issues?" A: "Sure."). These facts make the majority of West's testimony incredible and the court cannot assign it any significant weight.

16. West's demonstrative exhibit (Exhibit C) provided a compilation of checks from J&B Tool's Check Registry that separated the checks written from October 24, 2014 to July 5, 2017, into workweeks with the total for each workweek calculated. The exhibit showed each check's date (per the Check Registry), corresponding day, and the check's amount. The exhibit then takes the total money paid in one week and divides that number by $14.00 (if before December 21, 2015) or $15.00 (if on or after December 21, 2015) to determine the number of hours West

believes that he worked that week. West testified that without using this spreadsheet he only has a general recollection that he regularly worked over forty (40) hours a week. The court does not find West's theory based on the spreadsheet's calculations credible. First, West testified that if he did not work overtime, then he would leave at 5:00 p.m. His testimony never indicated that there were weeks he worked less than forty (40) hours per week. Out of the 128 weeks in West's spreadsheet sixteen weeks were less than forty (40) hours per week, with some of the weeks only twenty to thirty hours. This may have been due to vacation time, but West never testifies to that nor explains the contradiction between these calculations and his testimony. Second, and more significantly, many of the "overtime" week's calculations are simply incredible. For instance, the week of June 1, 2015, West was paid $1,883 in one week. Therefore, he calculates he worked 134.50 hours that week. Even if the court accepts West's testimony that he worked seven days a week, he would have had to have worked more than 19 hours every day for seven days, plus his commute time, without breaks. Then, the following week (of June 7, 2015), West was paid $2,050 in one week or, according to his theory 146.50 hours worked that week. Thus, he would have worked approximately 21 hours/day every day for seven days. West provided no testimony regarding these weeks. Even if he worked without *any* breaks until 2 a.m. and came back at 8 a.m. every day, as his most extreme testimony claims, this would only result in 126 hours. These weeks, and the several other instances of weeks well above 100 hours/week, are unreasonable. Without a valid explanation they undermine West's attempts to reverse engineer the amount of hours worked based on J&B Tool's Check Registry. Third, West provided no testimony or explanation as to why there were often several checks listed in the Check Registry on the same day.

17. Karla Kaufman's testimony similarly carries little if any weight. She could not remember exactly when or how long West lived with her. She testified that she was sometimes asleep before West would come home, but she did not testify on those nights that she saw Rudicil driving West home.

18. The court finds Rudicil's testimony more credible. His explanation that West started out as hourly and then switched to piece rate was the only testimony that explained the shift in the Check Registry from payroll to subcontractor. Rudicil is also the only witness that explained why in many instances there were numerous checks listed in the Check Registry on the same day. First, Rudicil explained that sometimes he would give West his check for the pieces he had completed and then West would ask for a loan or an advance on not-yet-finished jobs. This aligned with West's testimony that he got paid whenever he needed the money. Second, Rudicil testified that the Check Registry dates did not always align with the date the check was written because he would catch-up on paperwork later. Thus, Rudicil may have written two or three checks to West before Rudicil was able to update Quick Books.

19. The court does not fully credit West's testimony regarding his tools. When West was testifying regarding his hourly wage rates he testified that he could not remember hours worked or when his raise from $14.00 to $15.00 per hour occurred given the time between his employment and his testimony. Yet, he remembered in great detail the tools Rudicil had refused to return to West and their replacement values. Moreover, the text message sent from West to Rudicil discussed coming over to J&B Tools to pick up his toolbox, but it did not indicate that West was still missing other tools. (Exhibit 1).

## II.  CONCLUSIONS OF LAW

West claims that he regularly worked more than 40 hours per week and the J&B Tools and Rudicil's failed to pay him one and a half times his regular compensation for those hours. He brings claims under the Fair Labor Standards Act, 29 U.S.C.§ 207 *et. seq.* ("FLSA") and the Indiana Minimum Wage Law, Ind. Code § 22-2-2-4 *et. seq.* ("IMWL")  to recover unpaid overtime compensation and liquidated damages. The IMWL states that an "employer" under that statute "shall not include any employer who is subject to the minimum wage provisions of the [FLSA]." Ind. Code § 22-2-2-3. Therefore, the IMWL does not apply when the FLSA applies. *See Abner v. Dept. of Health*, 777 N.E.2d 778, 785 (Ind. Ct. App. 2003) (reiterated that "the [FLSA] is the exclusive remedy for enforcing rights created under that federal statute.") (citation omitted).

### a.  West's Claim Pursuant to the Fair Labor Standards Act

1. Pursuant to 29 U.S.C. § 207(a)(1) of the Fair Labor Standards Act:

> [n]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half the regular rate at which he is employed.

2. The parties have stipulated that J&B Tools and Rudicil are employers pursuant to the FLSA[5] and that West is covered by the FLSA under "individual coverage."[6]

---

[5] The statute defines the word "Employer" to include, "any person acting directly or indirectly in the interest of an employer in relation to an employee. . . ." 29 U.S.C. § 203(d).

[6] The court presumes the parties' stipulation that West falls under the "individual coverage" of the FLSA is referencing 29 U.S.C. 207(a)(1)'s coverage of "employees who in any workweek is engaged in commerce or in the production of goods for commerce." West's posttrial brief references the same (Docket No. 89 at ECF p. 6) without objection from Defendants. *See also Kowalski v. Kowalski Heat Treating, Co.*, 920 F. Supp. 799, 803 (N.D. Ohio 1996) (holding that

      3. It is a longstanding rule that "an employee who brings suit under [Section 217(a) of the FLSA] for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946). Courts must give due regard "to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours, and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687. If an employer fails to keep adequate or accurate records, then an employee

> [h]as carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687–88.

      4. Here, West has not carried his initial burden of proving that he performed uncompensated work. As stated above, the court did not find his testimony believable to any significant degree due to his drug problem during the relevant period, which likely affected his memory and recall ability, and, more importantly, because even West's most extreme testimony does not support his theory regarding the Check Registry. While the standard does not require

---

fact that employee cannot assert "enterprise" coverage under the FLSA because company has annual sales revenue of less than $500,000 does not also require a finding that company does not engage in interstate commerce for purposes of "individual" coverage).

West to show a precise amount for which he claims he was improperly compensated, the inconsistencies between his testimony and his own exhibit raise credibility issues that were unaddressed at trial. Even if West had met his burden of proving that he had performed work for which he was improperly compensated, the court finds he has not produced sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. Again, West's calculation theory in his demonstrative exhibit made several weeks simply unbelievable—or in another word, unreasonable.

5. Because West has failed to carry his initial burden, the burden does not shift to Defendants to provide evidence of a precise amount of overtime or to negate the reasonableness of the inference to be drawn from West's evidence. West's claim for overtime pursuant to the FLSA fails.

### b. West's Claim Pursuant to Indiana's Minimum Wage Statute ("IMWL")

6. West brings a claim against J&B Tool, only, pursuant to the Indiana Minimum Wage Statute. (Docket No. 1 at ECF p. 4). Despite alleging the claim in the complaint, this claim was not specifically identified in his statement of claims (Docket No. 47), nor discussed at trial, nor briefed in West's post trial submissions (Docket No. 89). This is likely because, having stipulated that the FLSA applies, the necessary result is that the IMWL cannot apply. *See* Ind. Code § 22-2-2-3 (An "employer" under the IMWL "shall not include any employer who is subject to the minimum wage provisions of the [FLSA]."). Even if not, this claim would still fail.

7. Under the IMWL, an "employer" is defined as "any individual, partnership, association, limited liability company, corporation, business trust, the state, or other governmental agency or political subdivision during any work week in which they *have two (2)*

11

*or more employees.*" *Id.* at § 22-2-2-3 (emphasis added). The record is devoid of any evidence that J&B Tools employed at least two (2) employees during a work week. Another employee was briefly mentioned during testimony, but there is no evidence as to when or how long he worked for J&B Tools. There is also no evidence that Rudicil himself would have qualified as an employee under the statute. *See id.* While the parties stipulated that J&B Tools was an employer under the Indiana Wage Claims Statute, that statute's definition of an employer is different than the Minimum Wage Claims Statute. *Compare* Ind. Code § 22-2-9-1 *with* Ind. Code § 22-2-2-3.

### c. West's Claim Pursuant to Indiana's Wage Claims Statute ("IWCL")

8. West brings a claim against J&B Tool, only, pursuant to the Indiana Wage Claim Statute. (Docket No. 1 at ECF p. 5). Again despite alleging the claim in the complaint, this claim was not specifically identified in his statement of claims (Docket No. 47), nor discussed at trial, nor briefed post trial (Docket No. 89). The complaint alleges that J&B Tool failed to pay West his accumulated, unused and/or pro-rata vacation time upon his separation from employment. However, the record contains no evidence regarding West's vacation time, used or unused. And to the extent that West cites the Indiana Wage Claims Statute to seek unpaid overtime wages after his termination, this claim fails for the same reasons discussed above. *See Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 490 (7th Cir. 2011) (explaining that the Indiana Wage Claims Statute, Indiana Code § 22-2-9-2, applies to employees seeking unpaid wages after their employer has fired them, where the Indiana Wage Payment Statute, Ind. Code § 22-2-5-2, applies to current employees and employees who voluntarily leave their employment, who are seeking unpaid wages).

### d. West's Claim Pursuant to Indiana's Crime Victim's Act ("CVRA") and his corresponding Replevin claim.

9. Finally, West presented testimony at trial that J&B Tool and Rudicil kept some of his tools and refused to give them back, thus entitling him to treble damages, attorney fees, and costs pursuant to the CVRA. Ind. Code § 34-24-3-1 *et seq.* The CVRA permits a person who has suffered pecuniary loss to bring a civil action if the loss was the "result of a violation of IC 35-43, IC 35-42-3-4, or IC 35-45-9." *Id.* Included among these criminal statutes is liability for criminal conversion under Ind. Code § 35-43-4-3(a). To prevail on a CVRA claim from criminal conversion in Indiana, an individual must show that a person "knowingly or intentionally exert[ed] unauthorized control over the property of another person." *Id.*

> A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so. A person's control over property of another person is 'unauthorized' if it is exerted in a manner or to an extent other than that to which the other person has consented.

*French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166 (Ind. Ct. App. 2008) (quotation marks and citations omitted). The moving party must prove each of the elements of conversion by a preponderance of the evidence. *Id.*

10. Additionally, "[i]n any criminal conversion action, criminal intent is an essential element that must be proven. . . . It is this *mens rea* requirement that differentiates criminal conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not intended to cover." *French-Tex Cleaners, Inc.*, 893 N.E.2d at 1166–67. However, this *mens rea* element of the criminal conversion statute, Ind. Code § 35-43-4-3, is not an element of tortious conversion. *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1058 (S.D. Ind. 2011); *Catellier v. Depco, Inc.*, 696 N.E.2d 75, 78 (Ind. Ct. App. 1998).

13

"To prove [tortious] conversion, a plaintiff must demonstrate that the defendant 'exert[ed] unauthorized control over property of another[.]'" *Meridian*, 763 F. Supp. 2d at 1058 (quoting Ind. Code § 35-43-4-3). Like all civil claims, tortious conversion "must be proven by a preponderance of the evidence." *Id.*

  11. As discussed above, West's testimony regarding the precise tools and prices that he claims were unlawfully retained by Defendants was incredible. The inconsistency of West's testimony of what he could recall with great detail and what he could not recall with any detail from the same time period made his testimony regarding his tools incredible. Moreover, West admitted Rudicil did permit him to pick up his toolbox and a text message was entered into evidence supporting that concession. Given Rudicil did return West's toolbox, the court finds Rudicil's testimony more credible that he looked around the shop and did not find any other tools belonging to West. West has not shown by a preponderance of the evidence that Defendants exerted unauthorized control of any of his tools. This claim, and West's replevin claim, fail.

### III. CONCLUSION

  For the reasons detailed above, the court concludes that Plaintiff Ronald West shall take nothing by its complaint and Defendants J&B Tool, LLC, Myron K. Rudicil, and William Clements are entitled to judgment on all claims against them. Final judgment will be entered accordingly.

  **SO ORDERED.**

Dated: 7/14/2020

Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Served electronically on all ECF-registered counsel of record.